Durfee, Judge,
delivered the opinion of the court:
Plaintiffs, citizens and permanent residents of Saipan, Mariana Islands, allege in this action that the United States Government has taken their property, i. e., trochus[1] shells, without just compensation in violation of the Fifth Amendment of the Constitution. Plaintiffs, therefore, claim compensation for the alleged taking.[2]
The Island of Saipan is a part of the Trust Territory of the Pacific Islands, and on the dates pertinent herein was governed and administered by the United States Navy, under Executive Order No. 10408[3] on behalf of the United States, under a United Nations Trusteeship approved by Joint Resolution of Congress, dated July 18, 1947.[4] On June 6, 1956, the Naval Administrator of Saipan published the following notice:
To: All Permanent Residents of the Saipan District, Trust Territory of the Pacific Islands
1. It has come to the attention of the Naval Administrator that trochus shells of less than three (3) inches in diameter at the base have been taken in violation of Sections 771 and 774 of the Code of the Trust Territory of the Pacific Islands. The foregoing was confirmed by an investigation made jointly by LCDR Glenn A. Evans, Lt. William C. Ruddick and Mr. John P. Raker, all of Naval Administration Unit, Saipan.
2. All persons owning or possessing trochus shells of less than three (3) inches in diameter at the base are required to deliver such trochus shells to the Mayor of Saipan, Ignacio Benavente, or to his authorized representative, at the Mayor’s office in Chalan Kanoa, on or before 12 June 1956. The Mayor or his authorized representative will weigh such trochus shells and issue receipts for such trochus shells so delivered. Such *428 trochus shells will be sold by the Government and the proceeds thereof placed in the District Revenue Funds to be utilized for the direct benefit of the indigenous population. ‘
3. Any person failing to deliver such illegal sized trochus shells as required by paragraph two (2) above, or anyone discovered to be in possession of illegal, sized trochus shell after 12:00 noon, 12 June 1956 will be prosecuted under Sections 771 and 774 of the Code of the Trust Territory of the Pacific Islands.
4. The exportation from the Saipan District of trochus shells of less than three (3) inches in diameter at the base by anyone except the Government is and will be prohibited.[5]
The present plaintiffs were primarily merchants who did not dive for, or harvest the trochus shells, but instead purchased them for export from persons who gathered them. Plaintiffs had in their possession some 25,000 pounds of undersized trochus shells, i.e., shells with a diameter less than three inches at the base. As a result of the notice of June 6, 1956 plaintiffs delivered said undersized shells to a representative of the U.S. Naval Administration Unit. No force was used against plaintiffs in an effort to cause them to part with the shells. Plaintiffs surrendered the shells in the belief that if they did not do so, they would be prohibited from exporting the shells and further, that they would be subject to prosecution. The U.S. Naval Administration Unit thereafter exported and sold the shells to Japan. The *429 proceeds from tbe sale of these undersized trochus shells were paid to the Treasurer of the Municipality of Saipan to be used for charitable purposes and for the benefit of local indigents.
Plaintiffs twice protested the confiscation of the trochus shells by the Naval Administration. By letter of June 27, 1956 they wrote the Naval Administrator, requesting that he reconsider his June 6 notice and not require a confiscation of the undersized shells. The letter also states in part:
It is deeply regretted that our acts of negligence resulted in a violation of the Trust Territory Code relating to the collection of trochus. May we invite your attention to the fact that we took for granted the collection of this size trochus was all right because of the practice of the past several years.
We now pledge ourselves that the collection of undersized trochus will not occur again.
The Naval Administrator replied to plaintiffs’ letter, and rejected their request. In so doing, he stated in part:
You have given as a reason for requesting reconsideration “the fact that we took for granted the collection of this size trochus was all right because of the practice of the past several years.” This allegation is not clear, as I have not knowingly permitted the illegal collection or sale of trochus. I have no authority to waive the provisions of the Trust Territory law, nor does any of my subordinates have such authority.
On 8 March 1956, a public notice was issued in the English, Chamorro, and Carolinian languages, over my signature. This notice established the trochus season and repeated the provisions of the Code of the Trust Territory which prohibits the taking of trochus with a shell less than three inches in diameter. This notice was widely distributed and all of you were aware of its contents.
Even if there has been some undisclosed laxness in law enforcement in the past, the provisions of the above notice clearly state that no undersized trochus should be taken.
The second protest of the confiscation was made in 1960 through an attorney. In this protest plaintiffs for the first time alleged that the shells had not been illegally harvested, but instead, were dead shells that had been picked up on the *430 beach after storms. The Commander-in-Chief of the U. S. Pacific Fleet rejected the. protest and replied' to plaintiffs, on February 28, 1961. The Commander-in-Chief stated that there was no merit to plaintiffs’ claim. Plaintiffs thereafter brought suit in this court, seeking just compensation f or the confiscated trochus shells.
Plaintiffs rely upon two prior cases decided by this court. Dore et al. v. United States, 119 Ct. Cl. 560, 97 F. Supp. 239 (1951) and Arkansas Rice Growers Cooperative Association v. United States, 137 Ct. Cl. 442 (1957), in support of the’ proposition that plaintiffs’ surrender of the shells constituted a taking by the Government. In both Dore and Arkansas Rice Growers, supra, plaintiffs were millers of rice who sued for just compensation for quantities of rice delivered to the Government pursuant to war regulations under compulsory set aside orders. Plaintiffs were paid low OPA ceiling-prices, which caused plaintiffs to incur losses. The court held that such forced sales constituted takings by the Government, as it had not paid plaintiffs just compensation within-the meaning of the Fifth Amendment. We do not believe these cases are applicable to the case at hand. In Dore and Arkansas Rice Growers, there was no doubt that the rice belonged to plaintiffs. They had legal title to the rice before they were forced to sell it. We do n,ot believe that plaintiffs in the case now before us had any title in or right to possession of the trochus shells. The shells, in fact, were contraband.
At the time in question here there was in effect in the-Trust Territory a section of the local code which provided
Seo. 22. Common law applies except when The-Common Law of England and all Statutes of Parliament in aid thereof in force and effect on July 3,1776, and as interpreted by American decisions, are declared to be* the law of the Trust Territory of the Pacific Islands * * *
The common law to which we are thus referred has from the earliest time contained general rules concerning animals-ferae natwrae. Animals ferae naturae, i.e., wild animals,, birds and fish in their natural state were not objects of private-ownership. They belonged to all the people in their collective capacity. An individual could, however, become an-owner of a wild animal if the animal were reduced to the *431 possession of that individual. While these fundamental principles have undergone little or no change, the development of free institutions recognized the fact that the state ;as the sovereign and representative of the collective people had the authority to exercise power or control over animals .ferae natu/rae as a trust for the benefit of a people. Implicit in this power was the right to regulate or absolutely prohibit the taking of, or traffic in, animals ferae naturae, if such action was deemed necessary for the protection or preservation of the public good. An excellent analysis and development of the common law in this area is contained in Geer v. Connecticut, 161 U.S. 519 (1896).
This court, in Aleut Community of St. Paul Island v. United States, 127 Ct. Cl. 328, 334, 117 F. Supp. 427, 431 (1954), discussed the Geer case, supra, as follows:
* * * * *
In that opinion Justice White discussed at length the rights of citizens in wild game. The substance of his discussion is that no private citizen or group of private citizens has any property right in wild game to the exclusion of other citizens, but that they have the right to reduce it to possession, but no greater right to do so than other citizens, and that this right is subject to the undoubted power of the sovereign to regulate it or to absolutely control or forbid it.
In the present case, the harvesting of trochus with a shell base diameter of less than three inches was forbidden by law. The law was promulgated in accordance with the common law right to regulate or forbid the taking of animals ferae naturae. The shells here in question were harvested in violation of the law, and therefore, no property rights could be acquired in them by those who had gathered them. The shells were, in effect, contraband. Since plaintiffs were merchants long experienced in buying and selling trochus shells, we believe they must have had actual knowledge of the prohibition against the gathering of undersized shells. They have never alleged otherwise. Plaintiffs cannot, therefore, claim to be innocent purchasers.[6] The shells in their possession were, *432 therefore, likewise contraband and subject to confiscation.[7]
Plaintiffs do contend that a past policy of the Naval Administrative Unit allowed trafficking in undersized shells. The Naval Administrator flatly denied this allegation. We hold that plaintiffs have not proven a policy contrary to the harvesting statute inasmuch as plaintiffs [have presented only bare allegations by interested parties.
Plaintiffs have also contended that the shells were not harvested, but were found on the beach after storms. This allegation was not made until more than four years after the shells were turned over to the Navy. (See Finding 14.) Just as the Commander-in-Chief of the U.S. Pacific Fleet found this aspect of the claim to be without merit, so does this court. Plaintiffs are not entitled to recover, and the petition therefore is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
Pursuant to the order of reference in the above-entitled case the following determination and report of the facts is submitted.[1]
*433 1. Plaintiffs are citizens and permanent residents of Sai-pan, Mariana Islands.
2. The Island of Saipan is a part of the Trust Territory of the Pacific Islands, and on the dates pertinent herein was governed and administered by the United States Navy, under Executive Order No. 10408,[2] on behalf of the United States of America, under a United Nations trusteeship approved by Joint Eesolution of the Congress of the United States dated July 18, 1947.[3]
3. The Trust Territory Code, applicable to the Island of Saipan, and promulgated by authority of the United States High Commissioner of the Trust Territory, in force on the dates of the takings hereinafter described, contains provisions as set forth below in findings 17 and 18.
4. (a) By virtue of Executive Order 10408, dated November 10, 1952, the Department of the Navy became the agency of the Government charged with the civil administration of Saipan. The institution of such civil government by the United States Navy began on January 1, 1953, in accordance with the provisions of the above Executive order, and continued at all times material herein.
(b) Pursuant to Notice No. 5450, dated 19 August 1955, issued by the Secretary of the Navy, the establishment of the following activity under a Naval Administrator was reaffirmed : United States Naval Administration Unit, Saipan District, Saipan, Mariana Islands.
(c) By virtue of Navy Personnel Letter No. 117297/1625, dated August 30,1954, Commander Charles E. Miller became the Naval Administrator for the Island of Saipan, which position he held at the time material herein.
*434 5. In the exercise of the powers vested in him as Civil Administrator of Saipan, Commander Miller caused Public Notice No. 6-56 to be published on June 6, 1956, as follows:
To: All Permanent Residents of the Saipan District, Trust Territory of the Pacific Islands
1. It has come to the attention of the Naval Administrator that trochus shells of less than three (3) inches in diameter at the base have been taken hi violation of Sections III and 774 of the Code of the Trust Territory of the Pacific Islands. The foregoing was confirmed by an investigation made jointly by LCDR Glenn A. Evans, Lt. William C. Ruddick and Mr. John P. Raker, all of Naval Administration Unit, Saipan.
2. All persons owning or possessing trochus shells of less than three (3) inches in diameter at the base are required to deliver such trochus shells to the Mayor of Saipan, Ignacio Benavente, or to his authorized representative, at the Mayor’s office in Chalan Kanoa, on or before 12 June 1956. The Mayor or his authorized representative will weigh such trochus shells and issue receipts for such trochus shells so delivered. Such tro-chus shells will be sold by the Government and the proceeds thereof placed in the District Revenue Funds to be utilized for the direct benefit of the indigenous population.
3. Any person failing to deliver such illegal sized tro-chus shells as required by paragraph two (2) above, or anyone discovered to be in possession of illegal sized trochus Shell after 12:00 noon, 12 June 1956 will be prosecuted under Sections 771 and 774 of the Code of the Trust Territory of the Pacific Islands.
4. The exportation from the Saipan District of trochus shells of less than three (3) inches in diameter at the base by anyone except the Government is and will be prohibited.
6. (a) Plaintiffs were primarily or principally merchants who did not dive for or harvest the trochus, but who purchased them from the persons who gathered them, and then cleaned them and prepared them for sale, and the prepared shells were exported by them for sale to companies who used them in the manufacture of buttons and ornaments.
(b) In the years next, preceding 1956, some of the plaintiffs state that they had sold and shipped trochus shells, including shells less than 3 inches in diameter at the base, and that the naval personnel charged with the civil adminis *435 tration of Saipan knew of these sales and shipments, and collected and obtained payment on said shells of the royalty on trochus as provided for by section 772 .of the laws and regulations applicable in Saipan.[4]
(c) The Naval Administrator of Saipan states that prior to the time of the publication of Public Notice No. 6-56, he had no knowledge of illicit harvesting of trochus shells by the native population of Saipan and that neither he, nor anyone under his command, had ever permitted the illicit harvesting of trochus shells or had sanctioned or acquiesced in such practice.
7. (a) No force was used against the plaintiffs in an effort to cause them to deliver to the mayor of Saipan the undersized trochus shells which were in their possession at the time of the publication of Public Notice No. 6-56: The trochus shells were delivered to the mayor as the representative of the U.S. Naval Administration Unit, Saipan District, in the plaintiffs’ belief that if they did not surrender and deliver the trochus shells, they would be prohibited from exporting them from Saipan, and that they would be prosecuted for the commission of criminal offenses under sections 771 and 774 of the Code of the Trust Territory of the Pacific Islands,[5] and plaintiffs delivered the shells in order to escape prosecution.
(b) The following quantities of trochus shells were delivered by the named plaintiffs to the mayor as representative of the U.S. Naval Administration Unit, Saipan District, on or before June 12,1956:
(1) George F. Fleming_ 685
(2) Herman B. Guerrero-13, 589
(3) Josefa S. Guerrero_ 2,715
(4) Herman Kintol_ 2,079
(5) Pedro Lifoifoi_ 793
(6) Bamon Matsunaga_ 622
(7) Juan Sn. Pangelinan_. 2,043
(8) Joaquin G. Sabían_ 1,544
(9) Manuel S. Villagomez. 1, 587
Total (pounds) 25,657
*436 8. (a) After the mayor’s office had received the trochus shells delivered by those individuals complying with Public Notice No. 6-56, the municipality of Saipan transported the trochus shells, packed in gunny sacks, to Charlie Dock, Tanapag Harbor, Saipan, to await shipment to J apan on board the U.S. Navy LSM 448. The municipality’s sacks were stowed separately from those sacks of trochus shells which contained legal-sized trochus being shipped by their owners under separate bills of lading.
(b) En route from Saipan to Yokohama, Japan, LSM 448 encountered weather and seas of such degree that the shells burst out of their sacks and scattered about the deck, the tarpaulin came off, and the legal- and small-sized shells were mixed together. Upon arrival at Yokohama, Japan, the trochus shells were off-loaded at Center Pier, No. 9 Warehouse, Naka-Ku, Yokohama. Mr. Frank Brown, Internal Affairs Officer of the Naval Administration Unit, Saipan, and seller of the Government’s trochus shells, made arrangements for the sorting of the trochus shells on board LSM 448, and for Kentei Shin Nippon Sha, a Japanese surveyors and measurers association, to weigh the trochus shells off-loaded from the LSM 448. The shells were sorted into two categories: shells under 3 inches in diameter at the base, and shells of 3 or more inches in diameter at the base. After weight by Kentei Shin Nippon Sha, the Government’s trochus shells amounted to 25,829.564 pounds.
9. (a) The parties have stipulated that Jesus de Leon Guerrero (Komi), if called as a witness, would testify as follows:
(1) That he is the husband of the plaintiff (3) Josefa A. Guerrero,, and at the date herein pertinent was Sheriff of the Island of Saipan.
(2) That in the years prior to 1956 he and his wife, with the knowledge of and without objection by, the responsible naval officials, sold and shipped trochus shells which contained shells less than 3 inches in diameter at the base.
(3) That on, to wit, May 29, 1956, the sheriff noticed a military jeep parked in front of the house of Matilde Waki, inside the Kariso Koad, that he knocked on the door of the house, it was answered by Mrs. Waki, and the sheriff observed bottles of whiskey on the table, and *437 questioned Mrs. Waki as to wlio owned the whiskey, whereupon Lt. William C. Euddick, an officer of the United States Navy showed himself and stated that the whiskey was his. Upon being informed by the sheriff that the district orders prohibited the bringing of whiskey into the village by Navy personnel, Lt. Euddick became abusive and threatening.
(4) That the sheriff took Lt. Euddick and the whiskey to the insular constabulary headquarters, where Lt. Euddick telephoned the District Attorney, Mr. John P. Eaker, who came and took Lt. Euddick with him. The next morning, Mr. Eaker asked the sheriff to make a written report of the incident, which he did with the help of the clerk of the court.
(5) The sheriff was thereafter relieved of duty and was asked to resign by Commander C. E. Miller, the Naval Administrator, Saipan District, but refused to do so.
(6) The sheriff was informed that Lt. Euddick was trying to bring charges against him about the trochus, and Lt. Euddick, Mr. Eaker and Lt. Comdr. Glenn A. Evans came around making an inspection of the trochus.
(7) Thereafter trochus that had been accumulated by the sheriff’s wife, and by others of the plaintiffs, was taken by the authorities. In addition to the quantities listed on the official records, 1 additional ton of trochus was taken from the sheriff’s wife to cover the Navy’s expenses incurred in the sale of the trochus and in transporting the trochus to Yokosuka, Japan, in the vessel “LSM-448.” Mr. Eaker, in the presence of Lt. Comdr. Evans, and several policemen demanded that the sheriff turn over the additional ton of trochus, threatening that unless he did so, all of the trochus would be confiscated.
(b) At the pretrial conference, defendant duly objected to the admissibility of the foregoing testimony, as being immaterial. The objection was overruled as going to the weight.
10. (a) Based primarily on the foregoing testimony, plaintiffs have requested findings of fact as follows:
(1) Jesus de Leon Guerrero (Komi), the husband of Josefa S. Guerrero, plaintiff (3), on May 29, 1956, while sheriff of the Island of Saipan, took into custody Lt. William C. Euddick, U.S.N., on a charge of violating the district orders prohibiting the bringing of whiskey into the village, and took him and the whiskey to the insular constabulary headquarters. Lt. Euddick was released *438 from custody by Mr. John P. Raker, the District-Attorney.
(2) During the period of time that the sacks of tro-chus shells were stowed at Charlie Dock awaiting shipment to Japan on board LSM 448, information was received that Jesus de Leon Guerrero had not delivered to. the mayor’s office in accordance with Public Notice No.. 6-56 all of the illegal-sized shells that had been accumulated by his wife and that Guerrero intended to ship these shells to Japan without declaring them to the municipality. An investigation was then conducted; by Mr. John Raker, District Attorney, Lt. Comdr.. Evans, and six insular constabulary personnel. The inspection party first inspected Guerrero’s sacks of trochus shells and found that Guerrero had included in these-sacks a large quantity of trochus shells that were less, than 3 inches in diameter at the base. The inspection party instructed Guerrero that, because he was shipping; illegal-sized trochus shells, he should now deliver a certain number of sacks from this shipment to be included. with the shipment to be sold by the Government. Guerrero was also told that if he should refuse to deliver the-requested number of sacks to the Government, he could; not send any of his trochus shipment' on board the-Navy’s ship, and that he might be prosecuted for not complying with Public Notice No. 6-56. Guerrero delivered approximately 2,000 pounds of trochus shells to-the Government’s shipment. The inspection party found no other shippers to be in possession of trochus shells-less than 3 inches in diameter at the base.
(3) The Navy bill of lading No. 10-57, dated 5 July-1956, showing 25,657 pounds of trochus shells to have been loaded on board LSM 448 does not evidently include the 2,000 pounds of trochus shells taken from. Guerrero at Charlie Dock.
With the addition of Guerrero’s approximate 2,000» pounds of trochus shells, the total amount of trochus shells shipped by the Government should have been: about 27,418 pounds (net).
(4) Both the Naval Administration Unit at Saipan,, and Guerrero state that approximately 2,000' pounds of' trochus shells were taken from Guerrero at Charlie Dock shortly before the shells were shipped to Japan. The-receipt of payment for the Government’s trochus shells, „ and the weight list from Kentei Shin Nippon Sha agree within 411 pounds when compared with the list of individuals who delivered trochus shells to the-mayor’s office. The latter list excludes the trochus; shells taken-) *439 from Guerrero at Charlie Dock, and, therefore, approximately 1,600 pounds of trochus shells are unaccounted for, as is the payment to the Naval Administrator for the same trochus shells.
(b) Defendant, in its requested findings of fact, has duly excepted to the foregoing findings requested by plaintiffs because of the alleged lack of relevance and materiality of the-evidence upon which they are based. Defendant does not challenge the support of plaintiffs’ requested findings by the testimony which was received in evidence over defendant’s objection.
11. (a) The testimony recited in finding 9(a) and the requested findings set forth in finding 10(a) are irrelevant and immaterial to this action except insofar as they invite the-inference that, because of Lieutenant Kuddick’s arrest by Señor Guerrero on May 29,1956, and the subsequent involvement of the District Attorney, naval personnel, and members, of the insular constabulary, the subsequent action by the Naval Administrator (Commander Miller) in issuing Public-Notice No. 6-56 on June 6, 1956, was inspired by improper motives, punitive in nature.
(b) In the absence of corroboration, the suggested inference is not warranted by the evidence, particularly in view of the testimony by the Naval Commander as recited in finding 6(c).
12. On or about June 27, 1956, written complaint was made to the Naval Administrator, Saipan District, by these plaintiffs as follows:
We, the undersigned, respectfully request the Naval' Administrator to reconsider the penalty imposed on us; for purchasing undersized trochus.
It is deeply regretted that our acts of negligence resulted in a violation of the Trust Territory Code relating: to the collection of trochus. May we invite your attention to the fact that we took for granted the collection, of this size trochus was all right because of the practice of the past several years.
_ We now pledge ourselves that the collection of undersized trochus will not occur again.
There is trochus on hand in our possession which was; not confiscated and on which we will show a small profit. However, it is a real hardship on our little businesses to have a portion of our trochus confiscated after we have *440 made the investment in it, financing being obtained thru loans with interest, plus our overall business expenses and overhead.
13. The Naval Administrator, Saipan District, replied to plaintiffs’ letter of June 27, 1956, under date of July 3, 1956, as follows:
I have very carefully considered your request of 27 June 1956, submitted jointly by you and nine other merchants, for reconsideration of my action relative to those persons who were engaged in the illegal purchase and sale of trochus. This action was to waive criminal prosecution for those persons who turned in the illegal trochus to the Mayor by a certain date. The trochus so turned in is to be sold and the money turned in to the District Eevenue Fund, which fund is used for projects directly benefitting the people of Saipan.
You have given as a reason for requesting reconsideration “the fact that we took for granted the collection of this size trochus was all right because of the practice of the past several years.” This allegation is not clear, as I have not knowingly permitted the illegal collection or sale of trochus. I have no authority to waive the provisions of the Trust Territory law, nor does any of my subordinates have such authority.
On 3 March 1956, a public notice was issued in the English, Chamorro, and Carolinian languages, over my signature. This notice established the trochus season and repeated the provisions of the Code of the Trust Territory which prohibits the taking of trochus with a shell less than three inches in diameter. This notice was widely distributed and all of you were aware of its contents.
Even if there has been some undisclosed laxness in law enforcement in the past, the provisions of the above notice clearly state that no undersized trochus should be taken.
There were two reasons why I elected to waive criminal prosecution in the case of those who cooperated with the authorities in turning in undersized trochus. The first reason was the fact that the then sheriff was one of the principal offenders and all information pointed to the fact that many, if not all, of you were misled by his example, though such action was very foolish and makes you subject to criminal liability. The second reason was the fact that turning in the small trochus would cause substantially reduced profits, though not actual loss, from your trochus transactions.
*441 Criminal prosecution, on the other hand, could result in fines or imprisonments, or both, and very probably would also result in the confiscation of the trochus.
I believe that by waiving criminal prosecution under the above conditions, I have gone as far as my obligation to enforce the law will permit.
I regret very much that this action has caused a loss of income to some very enterprising businessmen; but I regret even more that these businessmen were so tempted by the lure of large profits that they knowingly and wilfully became parties to unlawful activities.
If you have any additional questions, or any information which you believe I should have, please feel free to contact me, Lieutenant Buddick, the investigating officer, or any other Naval Administration official.
14. On or about November 22,1960, an attorney in Agana, Guam, wrote to the Commander Naval Forces Marianas, as follows:
On behalf of Mr. A. Jesus Leon Guerrero and his wife, Josefa S. Leon Guerrero, of Saipan, I am making this claim for reimbursement of the proceeds of a considerable quantity of trochus shells seized by the Naval Administration Unit at Saipan during 1956 and sold in Japan to the Nanyo Boeki Kaisha Ltd., Tokyo.
I am also making similar claim on behalf of Eamon Matsunaga, George Fleming, Joaquin G. Sabían, Manuel S. Villagomez, Juan S. N. Pangelinan, Herman Kintol, Pedro Lifoifoi, and Herman K. Guerrero, from whom various quantities of trochus shells were seized.
No legal proceedings were taken to forfeit these shells and I have been informed that no investigation was made. I have also been informed that the majority of these shells were dead shells picked up on the beach after storms and that many had been in possession of these individuals for several years. Also that during the time the Filipino contract laborers were on Saipan many of these men harvested trochus not for the shells but because they consider trochus a delicious shell fish.
Checking the code of the Trust Territory, I admit that it is forbidden to take undersize trochus shells but nowhere in the Code do I find any prohibition against picking up on the beach the shells of dead trochus which cannot, of course, be re-planted.
A total in excess of 27,552 pounds of the shells was arbitrarily confiscated. Trochus shells are worth approximately $1,350 a ton, so you can see this is a considerable sum of money involved. Based upon what I *442 have been able to discover, it seems to me that this was an arbitrary action, part of which may have been the result of other factors. Little attention was paid to the normal, orderly, legal processes.
Am making this claim to yon as Commander Naval Forces, Marianas, because the administration of the Sai-pan District is under your direct command and I was not at all sure of any other official to whom I should direct this claim.
It appears to me that under the statute of limitations as contained in the Code of the Trust Territory, there is a sis year statute of limitations on matters of this nature.
I will appreciate your causing an investigation to be made of the background of this matter and advising me at your convenience of the outcome of such investigation and your determination of the merits of these claims.
15. Eeply was made to the claim identified in finding 14 above, by letter from the Commander in Chief, U.S. Pacific Fleet, under date of February 28,1961, as follows:
Reference is made to your letter of November 22,1960, to Commander, U.S. Naval Forces, Marianas, making claim in behalf of Mr. and Mrs. A. Jesus Leon Guerrero and others for reimbursement for trochus shells allegedly “seized by the Naval Administration Unit at Saipan during 1956 * * *." The matter has been thoroughly investigated and has been referred to me for consideration and reply in my capacity as administrator of civil government in the Saipan District of the Trust Territory of the Pacific Islands.
Upon a full review of the circumstances, I must inform you that there appears to be no merit to the claim that a quantity of trochus shells belonging to your clients was seized through any arbitrary or iflegal action of representatives of the Naval Administration Unit, Saipan.
16. Plaintiffs have not been paid any sum for the trochus shells hereinabove described, delivered to the U.S. Naval Administration Unit, Saipan District. The testimony of the U.S. Naval Administration is that the proceeds from the sale of these undersized trochus shells were paid to the Treasurer of the Municipality of Saipan to be used for charitable purposes and for the benefit of local indigents.
*443 17. As noted in finding 3, the Trust Territory Code contained the following general provisions:
’(1) Sec. 4. No deprivation of life, liberty, or property without due process. No person shall be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall any person be compelled in any criminal case to be a witness against himself. In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial; to be informed of the nature and cause of accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense. No crime under the laws of the Trust Territory shall be punishable by death.
(2) Sec. 5. No ex post facto law. No bill of attainder, ex post facto law, or law impairing the obligations of contráete, Shall be enacted.
* * * * *
(3) Sec. 14. Local customs recognized. Due recognition shall be given to local customs in' providing a system of law, and nothing in this Chapter shall be construed to limit or invalidate any part of the existing customary law, except as otherwise determined by the High Commissioner.
* * * * *
(4) Sec. 20. Laws applicable i/n the Trust Territory. The following are declared to be in full force and to have the effect of law in the Trust Territory of the Pacific Islands, hereinafter referred to in the laws and regulations as “Trust Territory”: (a) the Trusteeship Agreement; (b) such laws of the United States, as shall, by their own force, be in effect in the Trust Territory, including Executive Orders of the President; (c) these laws and regulations of the Government of the Trust Territory and amendments thereto; (d) District Orders promulgated by the District Administrators of the Trust Territory either with the approval of the High Commissioner or in accordance with Section 29; (e) the acts of legislative bodies convened under charter from the High Commissioner when these acts are approved by the High Commissioner or otherwise confirmed as law as may be provided by charter or the laws and regulations *444 of the Trust Territory; and (/) duly enacted Municipal Ordinances. (As amended by Executive Order No. 55,* dated March 27, 1956, and Executive Order No. 60,* dated Oct. 10,1956.)
(5) Seo. 21. Local Customs. The customs of the inhabitants of the Trust Territory not in conflict with the laws of the Trust Territory or the laws of the United States in effect in the Trust Territory shall be preserved. The recognized customary law of the various parts of the Trust Territory, in matters in which it is applicable, as determined by the courts, shall have the full force and effect of law, so far as such customary law is not in conflict with the laws mentioned in Section 20.
(6) Seo. 22.[6] Common law applies except when. The Common law of England and all Statutes of Parliament in aid thereof in force and effect on July 3, 1776, and as interpreted by American decisions, are declared to be the law of the Trust Territory of the Pacific Islands, except as otherwise expressly provided by Section 24 hereof or by the laws of the Trust Territory as now or hereafter established by legislation, regulation, executive order, proclamation or recognized local custom: Provided, however, that no person shall be subject to criminal proceedings, except as provided by the written laws of the Trust Territory or recognized local custom when the latter is not inconsistent with such written laws: Provided further, that nothing in this Section shall be construed so as to repeal, alter, change, enlarge or amend the procedures established on October 1, 1952, for determination of questions of fact and law by the courts of the Trust Territory, including the pleadings, practices and procedures prescribed elsewhere in the laws and regulations of the Trust Territory or in the rules promulgated bv the Chief Justice from time to time as prescribed by Section 178.
(7) Sec. 23. Spanish, German, and Japanese laios repealed. All laws, regulations, orders and ordinances *445 heretofore enacted, issued, made or promulgated by Spanish, German or Japanese authority which are still in force in the Trust Territory or any part thereof, are hereby repealed, except as provided in Section 24 hereof: Provided, however, that nothing herein shall change the effect of local custom which may have been included within the scope of laws, regulations, orders, or ordinances enacted, issued, made or promulgated as aforesaid.
* * * * *
(8) Sec. 28. Promulgation of new laws and amendments to these Regulations. New laws and regulations or amendments to these Regulations may be promulgated by the High Commissioner by Executive Order. Each Executive Order shall be fully promulgated when it is duly signed by the High Commissioner and shall become effective ninety (90) days thereafter unless specified otherwise therein. Immediately upon such signature by the High Commissioner, the Attorney General shall cause such Executive Order to be published by posting the same at Government offices of the Trust Territory. Such Executive Order shall be translated in whole or in summary from English to the native language and published by distribution to Micronesian officials and posting in their local government offices. A copy of each such Executive Order and the translation in whole or in summary into the native language or languages of each district shall be filed with the Clerk of Courts of the district who shall keep them open to public inspection at all times when his office is open for business.
* * * * *
(9) Sec. 35. Area covered by these Regulations. The provisions of these Regulations, and any and all amendments thereto, shall be in full force and effect, unless otherwise provided, in all of the Trust Territory which consists of the islands formerly held by Japan under mandate in accordance with Article 22 of the Covenant of the League of Nations and placed under the trusteeship system of the United Nations, with the United States as administering authority, by agreement of the United States and the Security Council of the United Nations, being the Mariana Islands other than Guam, and the Marshall and Caroline Islands.
18. As noted in finding 3, the Trust Territory Code contained the following specific provisions pertaining to trochus:
'(1) Sec. HO. Harvesting of trochus restricted. Tro-chus having been introduced and planted in the waters *446 of the Trust Territory and being considered a valuable asset which should be conserved, the 'harvesting or in any way intentionally interfering with the growth of trochus in the waters of the Trust Territory is hereby prohibited éxcept as provided herein.
(2) Sec. 771. Trochus season. Each District Administrator may designate and vary from year to year, an open season or seasons during May and June for the harvesting of trochus in his district: Provided, that such open season or seasons shall not total more than fourteen (14) days in any year. Public notice shall be given of the dates designated for harvesting of trochus in each district by posting in each local-government office a copy of such designation in writing in the predominant native language of that local-government area and filing a copy of each designation with the Clerk of Courts. During such an open season, any permanent resident of the Trust Territory may dive for and harvest trochus in the district to which the season applies, within those areas in which he has the right to fish under established local custom, provided that no trochus shall be taken whose shell is less than three (3) inches in diameter at the base.
(3) Sec. 772. Royalty. A royalty of one (1) cent per pound shall be paid to the Treasurer of the Trust Territory for all trochus shell, less than 10 per cent wormy, removed from the waters of the Trust Territory. This royalty Shall be due and payable by the person harvesting the trochus shell and shall be remitted within ninety (90) days after the removal of the shell from the water, to the District Finance and Supply Officer of the district within which the shell is harvested, except that if the shell is sold to an authorized exporter within ninety (90) days after the removal of the shell from the water, the tax shall be paid by the exporter direct to the Treasurer of the Trust Territory within sixty (60) days after the sale, and the seller shall have no responsibility therefor. All royalties due hereunder remaining unpaid at the expiration of the period provided above for payment shall bear interest from that date at the rate of six (6) percent per year. District Finance Officers shall remit monthly to the Treasurer of the Trust Territory, all royalties collected hereunder.
(4) Sec. 773. Reflantvng^ of trochus heds. If a District Administrator determines that underwater operations Which will interfere with an existing trochus bed are in the public interest, he may issue a written permit for the removal and replanting of such bed at the expense of the person or persons desiring to conduct the *447 underwater operations. Removal and replanting of tro-chus covered by such, permit is hereby authorized.
(5) Seo. 774. Penalties. Any person violating the* foregoing Sections pertaining to the harvesting of trochus shall, upon conviction thereof, be imprisoned for a period not exceeding six (6) months or fined not more-than one hundred dollars ($100), or both.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover. The petition is, therefore, dismissed.

 Troctn'is shells, at the time of the alleged taking complained of by plaintiffs, had a commercial value for the making of mother of pearl buttons and ornaments.

 These claims have already been the subject of protracted litigation. See footnote 1 of the Findings of Fact, post p. 432, for a background of the procedural aspects of the case. The only issue presently before the court relates to the plaintiff’s rights of recovery. The determination of the amounts of recovery, if any, has been reserved for further proceedings.

 Dated November 10, 1952, 3 C.F.R. 1949-1953 Comp. p. 906.

 61 Stat. 397.

 The sections above referred to of the Code of the Trust Territory of the Pacific Islands, sections 771 and 774, read as follows:
“Sec. 771. Trochus season. Each District Adminstrator may designate and vary from year to year, an open season or seasons during May and June for the harvesting of trochus in his district: Provided, that such open season or seasons shall not total more than fourteen (14) days in any year. Public notice shall be given of the dates designated for harvesting of trochus in each district by posting in each local-government office a copy of such designation in writing in the predominant native language of that local-government area and filing a copy of each designation with the Clerk of Courts. During such an open season, any permanent resident of the Trust Territory may dive for and harvest trochus in the district to which the season applies, within those areas in which he has the right to fish under established local custom, provided that no trochus shall be taken whose shell is less than three (3) inches in diameter at the base.
“Sec. 774. Penalties. Any person violating the foregoing Sections pertaining to the harvesting of trochus shall, upon conviction thereof, be imprisoned for a period not exceeding six (6) months or fined not more than one hundred dollars ($100), or both.”

 No inference should be drawn that had plaintiffs been innocent or bona fide purchasers they would have had good title or the right to possession.

 Defendant hag raised jurisdictional and constitutional issues in this case. We have found it unnecessary to pass on these issues.

 The petition in this case was filed on October 10, 1961. Seven months later, on May 10, 1962, pursuant to leave granted in open court, the petition was amended by typewritten attachment. Meanwhile, on November 15, 1961, defendant filed its motion to dismiss, to which plaintiffs responded as to a motion for summary judgment. Defendant countered on February 23, 1962, with a motion to strike plaintiffs’ response and a renewal of its motion to dismiss. The matter was argued and submitted on May 8, 1962, at which time plaintiffs were granted leave to file the amendment to their petition, and defendant was directed to file a supplemental memorandum. Thereafter, on June 11, 1962, defendant filed its motion for summary judgment, to which plaintiffs’ opposition was filed on August 10, 1962. Pursuant to the court’s order of September 28, 1962, remanding the case to the general docket for placement of “defendant’s motions * * * for oral argument upon the earliest available calendar,” the matter was again argued and submitted on December 3, 1962, on defendant’s motions to dismiss petition and for summary judgment. On December 17, 1962, the court entered its order denying both motions without prejudice and returning the case to the trial commissioner for further proceedings.
Defendant’s answer was filed on January 10, 1963.
Pursuant to the Standard Pretrial Order On Liability, filed July 1, 1963, a pretrial conference was held on March 5, 1964, following which a pretrial *433 conference memorandum was filed on the same day. At the pretrial conference, as recited in the memorandum, the parties (1) agreed that trial in the first instance would be limited to the right of plaintiffs as a matter of law to recover and (2) submitted an Agreed Statement of Pacts, together with their respective exhibits, on the basis of which it was agreed that each side would submit requested findings of fact in due course, without the taking of further evidence.
Plaintiffs’ requested findings of fact were filed on April 6, 1964. Defendant, in its requested findings of fact and objections has (1) requested inclusion of one additional provision from the Code of the Trust Territory of the Pacific Islands, to which plaintiffs agree, and (2) otherwise accepted plaintiffs’ findings subject to two exceptions which are duly noted hereinafter.

 Dated November 10, 1952, 3 C.F.R. 1949-1953 Comp. p. 906.

 61 Stat. 307.

 For text of section 772, see finding 18, infra.

 For the texts of these provisions, see finding 18.

 Section 22 was amended by Executive Order 76,* dated May 11, 1959, as follows: “Sec. 22. Common law applicable; exceptions. The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the united States, shall be the rules of decision in the courts of the Trust Territory in cases to which they apply, in the absence of written law applicable under Section 20 hereof or local customary law applicable under Section 21 hereof to the contrary and except as otherwise provided in Section 24 hereof; Provided, That no person shall be subject to criminal prosecution except under the written law of the Trust Territory or recognized local customary law not inconsistent therewith.’’

The Executive Orders referred to on this page are Executive Orders of the-High Commissioner of the Trust Territory of the Pacific Islands.