Tomaki JUDA, et al.

v.

The UNITED STATES.

Aikizi LEWIS, et al.,
Plaintiff-Intervenors

v.

The UNITED STATES.

No. 172–81L.

United States Claims Court.

Oct. 5, 1984.

Jonathan M. Weisgall, Washington, D.C., for plaintiffs and plaintiff-intervenors.

Lois J. Schiffer, Washington, D.C., with whom was Asst. Atty. Gen., F. Henry Habicht, II, Washington, D.C., for defendant. Wendy B. Jacobs, Dept. of Justice, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION

HARKINS, Judge.

During the period June 30, 1946, to August 18, 1958, the United States conducted a series of nuclear tests in the Marshall Islands that included detonation of 23 atomic and hydrogen bombs at Bikini Atoll and 43 atomic and hydrogen bombs at Enewetak Atoll. These tests necessitated removal of the inhabitants and their relocation to other islands, and resulted in severe physical destruction at the atolls directly involved, as well as radioactive contamination at other parts of the Marshall island chain. The effects of the testing program included: annihilation of some islands and vaporization of portions of others; permanent resettlement with substantial relocation hardships of some inhabitants; exposure to high levels of radiation of some inhabitants; and widespread contamination from radioactivity that renders some islands unuseable by man for indefinite future periods.

In 1981 and 1982, petitions on behalf of approximately 5,000 inhabitants of the Marshall Islands were filed in the United States Court of Claims to claim damages

that range from $450 million to $600 million for results of the atomic testing program. These cases were transferred to the United States Claims Court on October 1, 1982, pursuant to section 403(d) of the Federal Courts Improvement Act of 1982. 28 U.S.C. § 171, note (1982).

The Marshall Islands are a part of Micronesia, a United Nations Trust Territory administered by the United States. The component parts of the Trust Territory of the Pacific Islands (Trust Territory) are the Marshall, Caroline and Mariana island chains. The Trust Territory includes more than 2,000 islands and atolls dispersed throughout the Pacific Ocean, in an area approximately the size of the continental United States.

Until World War II, Micronesia was administered by Japan under a League of Nations Mandate. The islands came under the United States' control by military occupation in 1944. The United Nations and its Trusteeship Council were given jurisdiction over non-self-governing territories, and trusteeship agreements were executed between the United Nations and those signatory powers in de facto possession of such territories.

The United States was designated "administering authority" over the Trust Territory pursuant to an agreement ratified by the United Nations Security Council on April 2, 1947, and approved by Congressional joint resolution on July 18, 1947. 61 Stat. 3301, T.I.A.S. No. 1665. In 1947, military government was terminated, and administration of the Trust Territory was delegated to the Secretary of the Navy. Exec. Order No. 9,875, 3 C.F.R. 658 (1943–48 comp.). In 1951, some administrative responsibilities were transferred to the Interior Department. Exec. Order No. 10,-265, 3 C.F.R. 766 (1949–53 comp.). By the Act of June 30, 1954, as amended (48 U.S.C. § 1681 (1982)) Congress directed:

(a) Until Congress shall further provide for the government of the Trust Territory of the Pacific Islands, all executive, legislative, and judicial authority necessary for the civil administration of the Trust Territory shall continue to be vested in such person or persons and shall be exercised in such manner and through such agency or agencies as the President of the United States may direct or authorize.

Prior to 1962, responsibility for administration of the Trust Territory was divided between the Interior and Navy Departments. Effective July 1, 1962, the authority for civil administration of the Trust Territory was redelegated to the Secretary of the Interior with the direction to carry out the obligations assumed by the United States as the administering authority "under the terms of the Trusteeship Agreement and the Charter of the United Nations." Exec. Order No. 11,021, 3 C.F.R. 600 (1959–63 comp.). *See generally Porter v. United States*, 496 F.2d 583, 587–90, 204 Ct.Cl. 355 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). Pursuant to this authority, the Secretary of the Interior established a Trust Territory government, which included executive, legislative and judicial branches, with a High Commissioner as chief executive. Sec. Order No. 2,918, 34 Fed.Reg. 157 (1968).

In 1969, the United States began negotiations with the inhabitants of the Trust Territory directed to establishment of a framework for transition to constitutional self-government and future political relationships. During the negotiations, the Trust Territory became divided into four governmental entities: Northern Mariana Islands, Republic of Palau, Federated States of Micronesia, and Republic of the Marshall Islands.

The Northern Mariana Islands has attained commonwealth status. In 1976, its government and the United States entered into a Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America. *See* Pub.L. No. 94–241, 90 Stat. 263 (1976) (codified as amended at 48 U.S.C. § 1681, note (1982)). On October 31, 1980, a Compact of Free Association was initialed by the United States, the Republic of the Marshall Islands and the Federated

States of Micronesia. The Republic of Palau on November 17, 1980, initialed A Compact of Free Association and Subsidiary Agreements, and these documents were signed on August 26, 1982. A plebiscite in the Republic of Palau on February 10, 1982, approved this status.

At the time the inhabitants of the Marshall Islands filed their claims in the United States Court of Claims, negotiations with the governments of Palau, the Federated States of Micronesia and the Marshall Islands were continuing. On motions by defendant, prosecution was suspended in order to avoid interference with the negotiations, and to permit the parties to explore diplomatic resolution of the claims. The suspensions were terminated on April 13, 1983.

Negotiations with the governments of the Federated States of Micronesia and the Marshall Islands resulted in a Compact of Free Association, which, together with related agreements, was signed by the United States and by the government of the Federated States of Micronesia on October 1, 1982, and by the government of the Republic of the Marshall Islands on June 25, 1983. The Compact of Free Association was approved by majorities of the peoples of the Federated States of Micronesia and of the Marshall Islands in plebiscites observed by United Nations representatives which were conducted on June 21, 1983, and September 7, 1983, respectively. On March 30, 1984, the Compact of Free Association was submitted to Congress for its approval.

Article VII, Section 177, of the Compact provides a procedure for resolution of claims arising from the nuclear testing program conducted by the United States in the 1946–1958 period. The section analysis that accompanied the submission to Congress describes the arrangement:

> *Section 177.* In this section, the United States accepts responsibility for compensation owing to citizens of the FAS [Freely Associated States] for loss or damage to person and property resulting from the nuclear testing program conducted by the United States in the Northern Marshall Islands between 1946 and 1958. This section also provides that the United States Government and the Government of the Marshall Islands shall set forth in a separate agreement provisions for a full and complete settlement of all uncompensated claims which have arisen as to the Marshall Islands and its citizens. The separate agreement is also to contain agreed provisions for medical services and radiological monitoring as well as utilization of affected lands. This agreement has been concluded, is incorporated into the Compact, and provides for the establishment of a $150 million fund to finance the purposes of this agreement. This agreement settles all Marshall Islands claims arising from the nuclear testing program.

Throughout these proceedings, defendant has asserted that, when the Compact of Free Association has become effective on completion of all ratification procedures, all claims in these cases will be moot. The theory of defendant's assertion is that, under the Compact, the government of the Marshall Islands will have sovereignty with authority for its foreign affairs. The Republic of the Marshall Islands will have sovereign capacity that is recognized by the United States; that status according to defendant is sufficient to permit the Marshall Islands government legitimately to espouse plaintiffs' claims under international law. Plaintiffs contend defendant's position is erroneous because it is contrary to the international law concept that a state may espouse only the claims of individuals that were its citizens at the time of loss or damage. The Marshall Islands was not a sovereign state when plaintiffs' claims accrued and plaintiffs were not then its citizens, and, plaintiffs assert, the Marshalls will not be an independent state under the Compact of Free Association.

Defendant also specifically reserves its right to raise the defense that plaintiffs' claims are not justiciable in this court because they present a political question that is to be resolved in the context of govern-

ment-to-government negotiations between the United States and the Republic of the Marshall Islands. Defendant points out that since 1979 the Bikinians have had a popularly elected constitutional government. In connection with the political question issue, it is noted that the Court of Claims, in recognition of the complexities and costs in time and effort inherent in claims based on government conduct of the type involved here, suggested special jurisdictional legislation that would permit a morally satisfactory resolution of ancient wrongs. *Kabua, Kabua v. United States,* 546 F.2d 381, 385, 212 Ct.Cl. 160 (1976), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977).

Neither the political question issue nor the espousal issue is decided at this time. The ratification process for the Compact has not been completed, and neither issue has been briefed fully.

The 14 cases that have been filed by the Marshall Islanders involve claims from three sources. The *Tomaki Juda et al.,* case (docket No. 172–81L) filed March 16, 1981, and amended October 16 and December 21, 1981, includes as plaintiffs the 1,004 members of the Bikini community as of May 1, 1981, and is concerned with the claims of the inhabitants of Bikini Atoll. The *Johannes Peter, et al.* case (docket No. 461–82L) filed September 15, 1982, and amended on November 24, 1982, is concerned with the claims of more than 700 inhabitants of Enewetak Atoll.

Twelve cases are concerned with claims from 3,318 inhabitants of atolls and islands that were not used as atomic test sites. These claims are based primarily on the effects of radiological fallout and contamination that resulted from the test program, and were filed on September 9, 1981, and July 26, 1982. They were consolidated for these proceedings on July 20, 1982. The lead case (*Limojwa Nitol, et al.*—docket No. 543–81L) concerns claims relative to Maloelap Atoll. The other cases concern claims relative to Ailuk Atoll (No. 372–82L), Ailinginae Atoll (No. 544–81L), Wohtoi Atoll (No. 545–81L), Rongerik Atoll (No.

546–81L), Ujae Atoll (No. 547–81L), Utirik Atoll (No. 548–81L), Rongelap Atoll (No. 549–81L), Taka, Bikar, Bokaak and Erikub Atolls and Jemo Island (No. 550–81L), Mejit Island (No. 551–81L) and Lae Atoll (No. 552–81L).

The claims of the inhabitants of the Bikini Atoll and Enewetak Atoll, sites used for atomic testing, factually are significantly different from each other, and both are distinguishable factually from the claims in the *Nitol* series of cases. For these reasons, the three types of claims have been handled separately. Only the *Nitol* series of cases have been consolidated.

Defendant moved to dismiss the *Juda* case (No. 172–81L) on August 14, 1981, the *Nitol* cases (No. 543–81L consolidated) on May 13, 1983, and the *Peter* case (No. 461–82L) on May 19, 1983. Briefing for each case was separate, and the cases were argued separately on August 2, 1983.

■ Factual inquiry on a motion to dismiss under RUSCC 12 is limited. The issue is not whether the plaintiff ultimately will prevail; it is whether the plaintiff is entitled to offer evidence to support facts alleged in the complaint. Material allegations of fact alleged in the complaint are taken as true, and the court is obliged to consider them in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Aleut Community of St. Paul Island v. United States,* 480 F.2d 831, 833, 202 Ct.Cl. 182 (1973). For reasons that follow, defendant's motions to dismiss are denied. A separate memorandum will be filed in each case.

*Tomaki Juda, et al. (No. 172–81)*

In the *Juda* case, facts alleged in the amended complaint filed December 21, 1981, are taken as true for purposes of defendant's motion to dismiss. A summary of the material facts follows.

On November 10, 1945, the United States Joint Chiefs of Staff formed a subcommittee to develop plans for a series of controlled tests to study the effects of atomic

bombs on naval vessels and to search for an appropriate test site. In January 1946, the Joint Chiefs selected Bikini Atoll as the test site, and subsequently this choice was approved by the President. The American military governor of the Marshall Islands notified the Bikinians on February 10, 1946, that they must leave the atoll for the test. The Bikinians were told they could return when the United States no longer needed the atoll for atomic tests.

On March 7, 1946, the United States Navy moved the 167 inhabitants from Bikini Atoll by boat to Rongerik Atoll and left them with several weeks supply of food and water. Rongerik Atoll has nearly 75 percent less land area than Bikini, its coconut palms were inferior, and many species of fish customarily eaten at Bikini proved to be toxic in Rongerik's lagoon. Severe food shortages reduced the people to near starvation. In July 1947, a doctor reported that the Bikinians were "visibly suffering from malnutrition." In February 1948, an anthropologist sent by the United States government to examine the Bikinians found starvation conditions on Rongerik.

In March 1948, the Bikinians were moved by the United States Navy to temporary quarters on Kwajalein Atoll, and in September 1948, they were moved to Kili, an island 400 miles southwest of Bikini. Approximately, 550 Bikinians continued to live on Kili when the complaint was filed in 1981.

Kili is an island with approximately ⅙th of the land area of Bikini, it has neither a lagoon nor sheltered fishing grounds, and there is no protected anchorage. Access to the island is hazardous. Severe food shortages occurred on Kili in 1949, 1950, 1952, 1958, 1960, and 1968–69. Housing is inadequate and health care is deficient.

The United States detonated 23 hydrogen and atomic bombs on Bikini Atoll between June 30, 1946, and July 22, 1958. Two tests were air drops, two devices were detonated under water, and other devices were detonated on anchored barges. The nuclear tests caused severe destruction. Radioactive mud was dumped on the islands and

into the lagoon; coral, algae and shellfish on the reef were destroyed; and some of the islands were annihilated. In 1956, the Atomic Energy Commission (AEC) reported that all of the islands had received in varying degrees the resultant radioactive fusion and activation products. Testing at Bikini was a critical part of the United States' nuclear weapons development program; the atomic testing program cost at least $20 billion.

In 1968, an AEC Ad Hoc committee declared that Bikini was "once again safe for human habitation" and that exposures to radiation that would result from repatriation of the Bikini people "do not offer a significant threat to their health and safety." On August 12, 1968, the President announced that the major islands of Bikini were safe for human habitation and that the Bikinians could return.

In June 1969, eight Bikinians returned to the atoll to assist in resettlement; and 6 months later 23 workers moved from Kili to Bikini to begin construction of 40 homes. More Bikinians were moved from Kili to Bikini in the early 1970s. In June 1971, the AEC reported that well water tests showed that from a radiological viewpoint "the water is safe to drink."

On October 10, 1975, the Bikinians brought suit in United States District Court in Hawaii seeking to compel the United States to conduct a comprehensive radiological survey of Bikini Atoll. Tests in 1977 showed that the level of strontium-90 in Bikini Island well water exceeded acceptable United States standards. In April 1978, a medical team examination of islanders on Bikini showed an "incredible" 1-year 75 percent increase in body burdens of radioactive cesium-137, causing U.S. scientists to conclude that the people likely had ingested the largest amounts of radiation of any known population.

The district court litigation was settled on October 27, 1978; the parties agreed that a radiological survey would be completed by December 31, 1978. A radiological survey was conducted in late 1978; a preliminary report, dated May 15, 1979,

indicated that Bikini Atoll was not safe for human habitation.

In August 1978, the United States relocated some of the people from Bikini to Ejit Island in Majuro Atoll; others were moved back to Kili. No one has been allowed to reside at Bikini Atoll since that time. On July 1, 1979, the Interior Department reported to Congress that a final assessment of the radiological safety of Bikini and Eneu Islands was that Bikini Island could not be used for the next 30 to 60 years, and that Eneu Island would be placed off limits as a place of residence for at least another 20 to 25 years.

When the United States commenced atomic testing on June 30, 1946, the rights of the parties were not memorialized in any contemporaneous written agreement between the United States and the people of Bikini. On April 27, 1951, the Trust Territory Government (TTG), which had been created by the United States under the United Nations Trusteeship Agreement and certain Bikini Alabs (family heads) signed a document captioned "Release of Rights to Bikini Atoll" and a document captioned "Deed". In these documents, the Alabs, who were not represented by counsel, for themselves and the people of Bikini gave a release to the High Commissioner of the TTG for "all of the right, title and interest of all the people of Bikini Atoll, including the rights of the undersigned, to the Bikini Atoll." In exchange, the High Commissioner's deed granted from the public domain of the Trust Territory the island of Kili and three islets in Jaluit Atoll to "those persons who at the time of occupancy of Bikini by the United States owned any right, title and interest in the said Bikini Atoll."

On November 22, 1956, the High Commissioner of the TTG and the Bikini Alabs, who were not represented by counsel, executed a document captioned "Agreement in Principle Regarding Use of Bikini Atoll." This document recites that a meeting was held on Kili Island on November 9, 1956, to discuss a settlement for the past and future use of Bikini Atoll. Provisions in the agreement included: (1) the TTG would grant and convey full use rights from the public domain of the Trust Territory to Kili and the other three islets in Jaluit Atoll to "all of the people who possess land rights in Bikini Atoll, that is the commoners"; (2) the use rights in the aforesaid government lands would continue "until such time as it may be possible for the people to return to Bikini"; (3) the government of the Trust Territory and/or the government of the United States "shall possess the full use rights of the Bikini Atoll until such time as it determines it will no longer be necessary to occupy and use the said Atoll"; and (4) the sum of $325,000 shall be conveyed "to those persons, those commoners, who possess rights in Bikini Atoll." Of this sum, $25,000 was to be paid at the time of signing, and $300,000 was to be placed "in a trust fund to be established and administered by the High Commissioner." The agreement also contained the following statement about claims by the Bikinians:

Accordingly, the people and *alabs* signing this agreement agree that any future claims by Bikinians based on the use of Bikini by the Governments of the United States or the Trust Territory or on the moving of the Bikini people from Bikini Atoll to Kili Island shall be against them and not against the Government.

On June 20, 1957, a document captioned "Use and Occupancy Agreement for Land in the Trust Territory of the Pacific Islands Under The Administrative Responsibility of the Department of the Interior" was recorded in Record Book No. 1 of the Marshall Islands District. This agreement recites it was "made as of the 15th day of April 1946" by the TTG and the United States, that the TTG was the "owner of exclusive use and occupancy rights for an indefinite period of time" of the Bikini Atoll, and that the United States "desires to acquire the use and occupancy of the land" for an indefinite period of time.

This agreement provided that the TTG would grant and convey to the United States the exclusive right to occupy Bikini for an indefinite period and to save the

United States "harmless from any and all claims" arising from such use, except for claims arising from negligence. In a section on conditions of use, the agreement provided (1) that the use by the United States "shall be consistent with the provisions and purposes of the Trusteeship Agreement", (2) that on or about June 30, 1961, and on a similar date each 5-year period thereafter, the United States and the TTG would "jointly review and determine the need for continuing the use", with final decision in the President of the United States, and (3) that if a decision were made that a need for continued use and occupancy does not exist, the grant would terminate and "all interest in said land shall revert to" the TTG.

On March 17, 1970, the United States and the TTG executed a document captioned: "AGREEMENT ACKNOWLEDGING THE RETURN OF BIKINI ATOLL TO THE TRUST TERRITORY OF THE PACIFIC ISLANDS SUBJECT TO CERTAIN RETENTION AREAS AND RIGHTS OF THE UNITED STATES OF AMERICA." This agreement, with minor exceptions, terminated the use and occupancy rights that had been given the United States by the TTG.

On January 24, 1979, the High Commissioner executed a document captioned "Quitclaim Deed" pursuant to the provisions of Order No. 3,030 of the Secretary of the Interior. This document purports to quitclaim and release all rights, title and interest of the TTG to the "people of Bikini, that is the Commoners, their heirs and assigns, represented by those Alabs who executed" the document captioned "Agreement in Principle Regarding Use of Bikini Atoll" on or about November 22, 1956. The lands subject to the quitclaim were all of the lands located within the Bikini Atoll, Kili Island and certain islands of the Jaluit Atoll. On January 24, 1979, accordingly, Bikini Atoll was returned to the Bikinians.

The Juda complaint lists three causes of action: (1) an unlawful taking of Bikini Atoll from March 7, 1946, to January 24, 1979; (2) an unlawful taking that began on January 24, 1979, and would continue for the next 20 to 60 years; and (3) breaches of fiduciary responsibilities imposed in 1946, which do not depend upon the Trusteeship Agreement, but are claimed to arise from a contract implied-in-fact that obligates defendant to protect the health, well being and economic condition of the Bikini people.

Defendant's motion to dismiss is based on three grounds: (1) plaintiffs' claims are barred by the statute of limitations; (2) the United States has not waived sovereign immunity as to plaintiffs' claims; and (3) plaintiffs have failed to state a claim upon which relief may be granted.

*Statute of Limitations*

This case was filed on March 16, 1981. The applicable limitations statute, 28 U.S.C. § 2501 (1982), bars any claim that is not filed "within 6 years after such claim first accrues" and bars any claim that accrued prior to March 16, 1975, in this case. Plaintiffs argue that the facts support two alternative taking theories: (1) a temporary taking that began on March 7, 1946, when the Bikinians were removed from the atoll, and ended on January 24, 1979, when the atoll was deeded back; and a second temporary taking that began in 1979, when it was first learned that Bikini could not be used for 30 to 60 years and that Eneu would be off limits for 20 to 25 years; and (2) a single temporary taking that began on March 7, 1946, that has not yet ended; the extent of this taking became clear in 1979 when it was discovered that the temporary taking could not be ended as promptly as planned, but would continue for an extended future period. The statute of limitations, plaintiffs claim, began to run on both takings in theory (1) in 1979, and on the single taking in theory (2), when its extent first became clear, in 1979.

Defendant views theory (1) as an artificial division on the facts because only the initial taking has significance, and, while the facts pleaded by plaintiff can serve as the basis of only one claim, as in theory (2), any taking that may have occurred was permanent, and it occurred, if at all, on March 7, 1946, the date the Bikinians were

removed from their atoll, or, at the latest on June 20, 1957, the date the TTG conveyed use and occupancy rights in the Bikini Atoll to the United States. Alternatively, defendant asserts the taking occurred on the date the United States' actions amounted to a substantial interference with plaintiffs' use of their property, which at the latest ceased in 1958 when the atomic testing ended. By either measure, according to defendant, plaintiffs' claims are time barred.

■ Plaintiffs describe the takings as "temporary" to underscore defendants' intent to restore the property on conclusion of the need for a testing site and to fix a taking date in 1979, when the extent of radiation damage became known. Whether a taking is characterized as "temporary" or "permanent" is of little significance in the determination as to whether a taking in fact has occurred, and it is not conclusive on the issue of when a suit must be brought on a taking claim. Such characterization has bearing on the measure of damages. *United States v. Dickinson*, 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947); *United States v. Dow*, 357 U.S. 17, 27, 78 S.Ct. 1039, 1047, 2 L.Ed.2d 1109 (1958); *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 888 (Fed.Cir.1983).

■ Just compensation jurisprudence is uniquely fact intensive. Denial of a taking claim on the basis of the defense of limitations is warranted only where the facts alleged demonstrate conclusively that such decision is required as a matter of law. In this case, the material facts embrace a sequence of actions over an extended time period, and include events which, in other contexts, may have been adequate to supply foundations for distinct taking claims. Here, the removal in August 1978 because of radiation dangers of the Bikinians, who had been assured in 1968 that the atoll was safe for resettlement, is an event that is sufficiently distinct in the temporal sequence to constitute a new and separate taking for purposes of a ruling, in a motion to dismiss, on the bar of limitations.

Defendant asserts this case is controlled by the decision in *Kabua, Kabua v. United States*, 546 F.2d 381. In that case, the terms of a 1960 agreement applicable to Roi-Namur, an island in Micronesia, which conveyed full use rights for an indefinite future to the United States, were virtually identical to the 1957 use and occupancy agreement with the Bikini Islanders. In 1960, the island became part of the Kwajalein Missile Range. In *Kabua, Kabua*, the court rejected a contention that a taking had occurred in 1975, on failure of negotiations for a long term lease, because the United States already had taken open and notorious possession in 1960 under a claim of right and had made large improvements under the 1960 agreement with the TTG, which purported to act as the owner. The Court of Claims found these facts were "consistent with no other view than that whatever ownership the plaintiffs have was taken long since." 546 F.2d at 383.

The facts in *Kabua, Kabua* differ significantly from the facts applicable to Bikini Atoll. Use and occupancy of Roi-Namur after 1960 by the United States was for the purpose of developing the Kwajalein Missile Range, and structures and improvements valued at $100 million were added to the realty in furtherance of this use. *See Armijo v. United States*, 663 F.2d 90, 92, 229 Ct.Cl. 34 (1981) (cattle grazing precluded by establishment of United States missile range as a permanent facility). Since 1960 no Marshallese has been allowed to reside upon or use Roi-Namur.

At Bikini, on the other hand, defendant has not employed the use and occupancy agreement as a basis for permanent occupancy and has not constructed facilities that contemplate long time or permanent occupancy. The agreement contains a standard provision that provides that the United States will review every 5 years the need for continuing the use and occupancy. Defendant's use of Bikini varied significantly after completion of the test program in 1958. Bikinians were permitted to return to the atoll and were encouraged and supported financially in this effort, with

contemporaneous assurances that conditions were safe for their return.

■ The doctrine announced in *Dickinson* and elaborated by the Court of Claims in a variety of factual contexts has application to the facts of this case. *Dickinson v. United States*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789. In *Dickinson,* the Court observed that property is taken in a constitutional sense "when in-roads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in a course of time," and that the Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding causes of action. 331 U.S. at 748, 67 S.Ct. at 1384. For statute of limitations purposes, the Court announced the following rule:

> When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided. All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really "taken."

331 U.S. at 749, 67 S.Ct. at 1385.

This rule is not limited to flooding cases. In *Avery v. United States*, 330 F.2d 640, 165 Ct.Cl. 357 (1964), the court applied this concept to an expansion of an existing avigation easement so as to include a new and further taking caused by the use of new aircraft that were larger and noisier. In *Castro v. United States*, 500 F.2d 436, 205 Ct.Cl. 534 (1974), the rule was applied to a taking of land on Saipan that was invaded and taken from the Japanese in 1944 and used by the United States from September 1946 to September 1968 for military purposes. *See also Silverberg v. United States*, 155 Ct.Cl. 436 (1961) (wartime price regulations applicable to slaughterers during the period 1943–46); *Oro Fino Consol. Mines, Inc. v. United States*, 92 F.Supp. 1016, 118 Ct.Cl. 18 (1950), *cert. denied*, 341 U.S. 948, 71 S.Ct. 1015, 95 L.Ed. 1371 (1951) (1942 government order prohibiting mining of gold during the war).

■ In their third cause of action, plaintiffs assert that a contract implied-in-fact was created in 1946 that imposed fiduciary obligations on the United States and that this contract has been breached in numerous ways. Defendant contends these nontaking claims are barred by the statute of limitations insofar as they accrued before March 16, 1975. For a number of reasons, for purposes of ruling on a motion to dismiss, the defense of the bar of limitations may not be invoked as to plaintiffs' nontaking claims.

Some of these claims clearly involve transactions that occurred after March 16, 1975. Between March 16, 1975, and August 1978, defendant placed Bikinians on an atoll that was unsafe for human habitation. After August 1978, the United States has barred the Bikinians from their atoll because it is uninhabitable as a result of defendant's actions. Since March 16, 1975, defendant has subjected plaintiffs to conditions on Kili that allegedly contravene standards applicable to inhabitants of the Trust Territory. In 1975, the United States agreed in a negotiated settlement to translate all major Bikini resettlement documents into Marshallese. Defendant, however, allegedly has never informed the Bikinians in Marshallese that the atoll cannot be resettled for 30 to 60 years, and has not translated other documents relating to the resettlement of Bikini. Plaintiffs are not barred by limitations from an offer of proof of the origin, nature, and content of the alleged implied-in-fact contract and fiduciary relationship, if any, with respect to these claims.

*Sovereign Immunity*

Defendant's motion to dismiss makes a broadside attack on grounds that sovereign immunity has not been waived on the implied-in-fact contract alleged in plaintiffs' third cause of action. Plaintiffs' third cause of action asserts that fiduciary obligations were assumed by the United States

in a contract implied-in-fact that arose in March 1946 when the United States undertook to care for the Bikinians as a result of their removal from the atoll. The complaint identifies numerous alleged breaches of these fiduciary duties.

Defendant's August 14, 1981, motion and the May 13, 1983, supplemental motion, assert the court lacks jurisdiction because: (1) all claims sound in tort; (2) plaintiffs' claims for breach of trust are not based on a statute expressly waiving sovereign immunity or on other congressional action that mandates money damages; (3) an implied-in-fact contract that creates a trust obligation on the United States arises only from management of "trust" property or the holding of a "trust" fund, and cannot arise when the United States acts as a sovereign; and, (4) 28 U.S.C. § 1502 (1982) bars all claims based on violations of the Trusteeship Agreement and the Trust Territory Code. In its June 30, 1983, reply brief, defendant supplemented its arguments with the following additional grounds: (5) the elements required to establish an implied-in-fact contract have not been pleaded; (6) the Trusteeship Agreement is an express contract that covers the same subject matter and thus precludes an implied-in-fact contract; and (7) the United States acts with respect to the Bikinians were sovereign acts in furtherance of the nation's defense and foreign policy goals.

 This court's Tucker Act jurisdiction includes contracts which are implied-in-fact. 28 U.S.C. § 1491(a)(1) (1982). *Russell Corp. v. United States,* 537 F.2d 474, 210 Ct.Cl. 596 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). Although a contract implied-in-fact is based on conduct, it requires a showing of the same contractual elements as that required to establish an express contract. The requirements of mutuality of intent and lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs. *Fincke v. United States,* 675 F.2d 289, 295, 230 Ct.Cl. 233 (1982); *Algonac Mfg. Co. v. United States,*

428 F.2d 1241, 1255, 192 Ct.Cl. 649 (1970). The representatives of the United States whose conduct is relied upon must have actual authority to bind the government in contract. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Jascourt v. United States,* 521 F.2d 1406, 207 Ct.Cl. 955, *cert. denied,* 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975).

Defendant argues that plaintiffs have not pleaded the requisite elements of an implied-in-fact contract and that the consideration alleged (abandoning homeland and exile to a different atoll to avoid damage from nuclear testing) cannot support an implied contract under the Tucker Act. The complaint which was amended on October 16, 1981, and on December 21, 1981, does not enumerate distinctly the requisite contract elements. The facts alleged, however, which for purposes of defendant's motion to dismiss are taken as true, establish conduct that is sufficient to show a tacit understanding and a meeting of the minds. The complaint alleges actions over a long period of time by responsible government officials authorized to act that fairly can be construed to show that defendant promised to take care of plaintiffs until it no longer needed Bikini for atomic tests, and that the plaintiffs, in exchange agreed to abandon their homeland and accept temporary exile at other locations. Such conduct, if shown, could support a contract implied-in-fact. At this stage, the court is concerned only with an examination of facts as alleged. Whether plaintiffs' evidence will be sufficient to establish the allegations as fact is a matter to be faced later.

 Claims that in fact sound in tort, even if couched in the language of an implied-in-fact contract, are beyond the scope of 28 U.S.C. § 1491(a)(1). *Aetna Cas. & Sur. Co. v. United States,* 655 F.2d 1047, 1059, 228 Ct.Cl. 146 (1981); *Somali Dev. Bank v. United States,* 508 F.2d 817, 820, 205 Ct.Cl. 741 (1974). Defendant contends each of the factual predicates listed in the complaint for an alleged breach of fiduciary duties is tortious in nature in that they

sound in negligence, deceit, misrepresentation, or abuse of regulatory functions. Defendant does not give effect to the alleged source of the fiduciary duties enumerated.

 In this case, plaintiff alleges a breach of contract; it is not fatal that the actions alleged could constitute both a tort and a breach of contract. If plaintiffs are able to establish that a fiduciary relationship was created by the alleged contract, the breaches of fiduciary obligations also would constitute a breach of contract and would support a claim for damages. The Claims Court has jurisdiction to consider a claim for breach of an implied-in-fact contract notwithstanding the possible existence of a tort remedy. *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980). Where an enforceable contract is alleged, an action for breach is not beyond the scope of the Tucker Act simply because elements of tort are present. *Burtt v. United States*, 176 Ct.Cl. 310 (1966).

 Defendant argues that claims based on breaches of fiduciary obligations are cognizable in this court only when the existence of the trust obligation is founded on a statute, an Indian treaty, an executive order or regulation, or a claim of a Fifth Amendment taking. Defendant points out that Congress has enacted no statute that makes defendant a fiduciary for the Bikinians, and no action by Congress mandates money compensation for the actions plaintiffs claim are breaches of fiduciary duties.

 In 28 U.S.C. § 1491(a)(1), Congress has waived the sovereign immunity of the United States for the classes of claims there defined. Defendant's argument does not take into account the distinction between the claims based upon breach of an authorized contract and claims founded upon the Constitution, a statute or regulation. The Claims Court is authorized in 28 U.S.C. § 1491(a)(1) to render judgment upon any claim that is founded on the Constitution, *or* on any statute or regulation of an executive department, *or* is founded upon any express or implied con-

tract. Where the claim is based upon the Constitution, a statute or regulation, the court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal government for damages sustained. *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II). Where a contract, express or implied, has been made by federal officials who Congress has authorized to so act on behalf of the United States, however, the court is not required to make further inquiry to determine whether a separate source of substantive law mandates compensation. Where such a valid contract has been made, a claim founded upon its breach is cognizable under the provisions of 28 U.S.C. § 1491(a)(1). The law of contracts mandates the compensation the United States is obligated to pay for a breach.

 Where a contract establishes a fiduciary relationship, the absence of a separate statutory basis that would mandate compensation for breach of fiduciary obligations does not deprive the court of jurisdiction over the breach claim. In 28 U.S.C. § 1491(a)(1), Congress has waived sovereign immunity with respect to a breach of "any" implied contract with the United States. The Court of Claims acknowledged it had jurisdiction when a breach of fiduciary duties based on an implied contract was alleged. *Fields v. United States*, 423 F.2d 380, 383, 191 Ct.Cl. 191 (1970). Defendant would limit an implied contract with fiduciary obligations only to situations where management of trust property or holding of a trust fund is involved. The terms of 28 U.S.C. § 1491(a)(1) are not so narrow; section 1491(a)(1) applies to "any" implied contract.

 Defendant claims the United Nations Trusteeship Agreement is the sole source of any fiduciary obligations of the United States to Micronesia, and points to the decision that the trust arrangement there does not add to this court's jurisdiction because of 28 U.S.C. § 1502. *Kabua, Kabua v. United States*, 546 F.2d at 385. Defendant argues that the Trusteeship

Agreement is an express contract which covers the same subject matter as covered by plaintiffs' claims based upon the alleged implied-in-fact contract, and that this express contract preempts and supercedes any implied-in-fact contract obligations toward plaintiffs.

As a general rule, the existence of an express contract between the parties precludes the existence of an implied contract between them dealing with the same subject. Any implied contract, to be valid, must be unrelated to the express contract. *ITF Fed. Support Serv., Inc. v. United States,* 531 F.2d 522, 528, 209 Ct.Cl. 157 (1976); *Algonac Mfg. Co. v. United States,* 428 F.2d at 1255.

Plaintiffs' implied contract and the fiduciary claims it includes are distinct from the obligations defendant undertook in the Trusteeship Agreement with respect to the inhabitants of the occupied territory. In the first place, the parties are not the same. The Trusteeship Agreement is between the United States and the Organization of the United Nations; the parties to the alleged implied contract are the United States and the Bikini Islanders. Further, the implied contract allegedly came into existence in 1946, while the Trusteeship Agreement was not entered into until 1947.

Plaintiffs' claims clearly do not grow out of, depend upon, or have their foundation in some treaty stipulation. *See United States v. Weld,* 127 U.S. 51, 57, 8 S.Ct. 1000, 1003, 32 L.Ed. 62 (1888); *Hughes Aircraft Co. v. United States,* 534 F.2d 889, 903, 209 Ct.Cl. 446 (1976). The rule that the existence of an express contract preempts an implied contract has full effect only when the parties to both contracts are the same. 17 C.J.S. *Contracts* § 5 (1963). The United Nations Trusteeship Agreement, by its terms, does not preempt the type of claims plaintiffs present; and it does not preclude claims based on an implied contract between the United States and peoples in the Trust Territory.

 Defendant also contends that the actions on which plaintiffs' implied contract claims are based were taken by the United States in its sovereign capacity in execution of its defense and foreign affairs functions. In support of the argument that a contract cannot be implied-in-fact from the sovereign acts of the United States, defendant relies upon *Horowitz v. United States,* 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925); *Air Terminal Serv., Inc. v. United States,* 330 F.2d 974, 165 Ct.Cl. 525, *cert. denied,* 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964); *Somerville Tech. Serv. v. United States,* 640 F.2d 1276, 226 Ct.Cl. 291 (1981); and *Aetna Cas. & Sur. Co. v. United States,* 655 F.2d 1047.

Whether particular acts of the United States are done in a sovereign capacity or in a proprietary capacity turns on the nature of the government's action and the relationship of the parties involved. Where the United States in furtherance of general public objectives enters contracts with local public agencies to provide loans or grant funds, as in *Somerville* and *Aetna,* the loan or grant program is undertaken in its sovereign capacity, and no express or implied contract results with those third parties who deal with the local public agency. In situations where the government is in privity of contract with a claimant, as in *Air Terminal,* no liability arises for government acts taken for benefit of the general public, even though the express contract is directly affected. The sovereign act defense has no application when the challenged government actions do not have public and general applicability, or when the actions were focused principally and primarily on the direct relationship with the injured claimant. *Sun Oil Co. v. United States,* 572 F.2d 786, 215 Ct.Cl. 716 (1978); *Ottinger v. United States,* 88 F.Supp. 881, 116 Ct.Cl. 282 (1950).

In this case, the United States' representatives dealt directly with plaintiffs. In a protracted course of dealings, plaintiffs were removed from a particular site and relocated so that the atomic testing program could proceed, allegedly with the creation of concurrent obligations incident to the removal and relocation. The atomic testing program itself clearly furthered

foreign affairs policy and defense objectives. That circumstance, however, is not sufficient to trigger the sovereign act defense. In the conduct of its foreign affairs and defense policies, the United States customarily enters a multitude of valid contracts that are subject to court review. The sovereign capacity on which these general programs were erected is implemented by contracts made in proprietary markets. The sovereign characteristics of the program does not create an umbrella to shield the government from liability for breach of the implementing contracts. A multitude of defense contractors would be surprised to be told that defense and foreign policy goals related to ship construction, aircraft production, and contracts to test munitions were unenforceable because the United States had made their contracts in exercise of its sovereign responsibilities for foreign policy and defense goals.

*Failure to State a Claim*

Defendant alternatively argues that plaintiffs' first and second causes of action should be dismissed on the ground that Congress has not extended the just compensation provision of the Fifth Amendment to property that is located in the Trust Territory of the Pacific Islands and is owned by Micronesians who are not citizens of the United States. Plaintiffs counter with and rely on decisions of the Court of Claims that have considered United States takings of property located in Micronesia, and elsewhere outside United States boundaries, citing: *Porter v. United States*, 496 F.2d 583; *Fleming v. United States*, 352 F.2d 533, 173 Ct.Cl. 426 (1965); *Seery v. United States*, 127 F.Supp. 601, 130 Ct.Cl. 481 (1955); *Turney v. United States*, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953).

The question of whether an allegation of a taking by the United States of property owned by Marshall Islanders in the Trust Territory of the Pacific Islands states a cause of action within the jurisdiction of this court has not been decided, either by the Court of Claims or by the Court of Appeals for the Federal Circuit.

In its initial brief on August 14, 1981, defendant requested the Court of Claims to reconsider the comments in *Porter* that indicated that the just compensation clause applied to takings by the United States of Micronesian property in Micronesia. In its June 30, 1983, brief, defendant acknowledged that its earlier position was in error and that the *Porter* decision did not control the case at bar and need not be overruled. In *Porter*, the Court of Claims held that it lacked jurisdiction on the taking claim because the plaintiffs had failed to show that representatives of the United States had carried out the alleged taking of the property. The plaintiffs there had focused on actions of Trust Territory officials in their taking claim, and those officials were without authority to act on behalf of the United States. In arriving at this holding, the court considered its jurisdiction under the just compensation clause and rejected as "overly rigid" defendant's assertion that "the Constitution does not extend even to territories or possessions of the United States until Congress passes an enabling act to that effect, which has not been done." 496 F.2d at 591. On the facts in *Porter*, no taking had been shown, and the court did not have to reach the constitutional issue.

Similarly, in *Fleming*, the constitutional issue did not need to be decided because the plaintiffs could not establish they legally had title to the undersized trochus shells allegedly taken. In *Seery*, the property taken was not owned by a noncitizen. There, a United States citizen sought payment for the taking by the United States Army of a house located in Austria for use as an officers club, and the case turned on plaintiff's status as a United States citizen. *Seery v. United States*, 127 F.Supp. 601, 130 Ct.Cl. at 489.

The *Turney* case was concerned with property located at the Leyte Air Depot in the Philippine Islands which had been sold as surplus to plaintiff for the account of the independent Philippine Government. The Manila government, prompted by "irresistible pressure" from the United States,

placed an embargo on removal of the property until plaintiff agreed to return certain radar equipment to the United States. The court held an unconstitutional taking had occurred. 115 F.Supp. 457, 126 Ct.Cl. at 214. In its rejection of defendant's contention that the Fifth Amendment does not apply in foreign countries, the court cited *Russian Voluntary Fleet v. United States*, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931) and *Wiggins v. United States*, 3 Ct.Cl. 412 (1867). Defendant points out that in neither case were the facts comparable either to *Turney* or this case. In *Russian Voluntary Fleet*, the property in dispute was located in the United States, and the United States had taken the property pursuant to an act of Congress that made the confiscation contingent upon the payment of just compensation. In *Wiggins*, the property that was taken belonged to a United States citizen, and it was located in Nicaragua, which at that time was a territory of the United States.

The relationship of the United States to the government of the Philippines differs in significant respects from the relationship of the United States to the TTG. The decision in *Turney*, on the facts, does not control the issue of this court's jurisdiction over a taking in the Trust Territory.

 Defendant's position is that the Trust Territory is neither a territory nor a possession of the United States and, as a result, citizens of the Trust Territory are not eligible to claim under the safeguards of the just compensation part of the Bill of Rights in the absence of legislation that specifically extends constitutional rights to those citizens. Whether and to what extent the Constitution applies outside the United States, according to defendant, depends upon the relationship of the locality in which the claim arises and the United States. The Bill of Rights, of course, is a fundamental safeguard against arbitrary government action and, with respect to citizens of the United States, is applicable to the United States government wherever it acts. The issue here is whether these fundamental rights are available to citizens of a United Nations Trust Territory for acts of the United States relative to their property in the Trust Territory.

The political status of the Trust Territory of the Pacific Islands is unique in international law. This unique status has resulted in considerable confusion in cases where it has been considered. The United States occupied the Trust Territory incident to the war with Japan, and until 1947, administered it through military government decree. The United States' acquisition and continued presence in this area make the Trust Territory unlike the territories which were acquired by purchase, such as Louisiana and Alaska, or which were acquired by treaty of cession after war, such as Puerto Rico and Hawaii.

After 1947, United States authority in the Trust Territory implements a Trusteeship Agreement with the United Nations, and the United States administration of the Trust Territory is based upon the President's treaty power conferred in Article II, section 2, clause 2 of the Constitution. The United States has not administered the Trust Territory under the authority conferred in Article IV, section 3, concerning regulation by Congress of territories or other property belonging to the United States.

In the *Porter* case, Nichols, J., concurring, noted that Congress in enabling legislation, 48 U.S.C. § 1681, did not set up a typical territorial government, but a simple dictatorship in which the President can govern the Trust Territory in any way he pleases. Subsequent congressional approvals of the office of High Commissioner and other organizational structures fashioned by the Interior Department lead to the conclusion that the purported territorial government can no longer be considered as an executive creation pure and simple. 496 F.2d at 593.

In the so-called "insular" cases, the Supreme Court fashioned a test that applicability of Bill of Rights safeguards to territories such as Puerto Rico, acquired by treaty cession and regulated by Congress under Article IV, section 3, depended upon

whether the areas were "incorporated" or "unincorporated" territories. *See, generally, Torres v. Commonwealth of Puerto Rico,* 442 U.S. 465, 469, 99 S.Ct. 2425, 2428, 61 L.Ed.2d 1 (1979); *Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904).

The insular cases were concerned with territories acquired by treaty cession, which had become part of the nation to which they were annexed. *Dorr v. United States,* 195 U.S. at 141–43, 24 S.Ct. at 809–10. These territories had different cultures and customs from the United States. The Court ruled that, until Congress acted to incorporate these territories into the United States as a body politic, only such constitutional protections as specified by Congress applied during a period of temporary pupilage and dependence. Defendant argues that the discussion of the insular cases and the Court's observation in *Torres* that Congress may make constitutional provisions applicable to territories in which they would not otherwise be controlling, is a reaffirmation of the doctrine of the insular cases with respect to unincorporated territories. Defendant reaches too far. In *Torres* itself, the concurring Justices noted with approval previous holdings that neither the insular cases nor their reasoning should be given any further expansion. 442 U.S. at 475–76, 99 S.Ct. at 2431–32. *Torres* does not establish that action by Congress is necessary in order to make constitutional provisions applicable to United States territories. The doctrine of the insular cases can be distinguished from the present case in that they were concerned with territories that belonged to the United States as a result of cession by treaty, whereas the Marshall Islands are administered pursuant to a United Nations Trusteeship Agreement.

The Trust Territory is not a territory of the United States, either incorporated or unincorporated. The unique relationship between the TTG and the United States was recognized by the Court of Claims in the *Porter* case. The court noted that the United States when it entered the Trusteeship Agreement made it clear that it did not consider its role of trustee to encompass sovereignty over the islands and that the citizens of the Trust Territory are not United States citizens.

Territories that are under the trusteeship system of the United Nations do not belong to the state under whose trusteeship they are placed. The trustee is not the sovereign of the Trust Territory. The Court of Claims observed that the most persuasive view on the question of sovereignty was that it rests in the people of Micronesia and is held in trust for them by the administrating power. *Porter v. United States,* 496 F.2d at 588, n. 4.

Defendant notes that laws of the United States do not extend to the Trust Territory under the Trusteeship Agreement. The Freedom of Information Act does not apply to the TTG. *Gale v. Andrus,* 643 F.2d 826 (D.C.Cir.1980). The Federal Tort Claims Act was held not to apply in an action brought by United States citizens for injuries sustained at the United States missile base at Kwajalein. *Callas v. United States,* 253 F.2d 838 (2d Cir.), *cert. denied,* 357 U.S. 936, 78 S.Ct. 1384, 2 L.Ed.2d 1550 (1958). The National Environmental Policy Act and the Administrative Procedures Act may not be invoked to review actions of the TTG. *People of Saipan v. United States Dept. of Interior,* 502 F.2d 90 (9th Cir. 1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). Salaries earned in the Trust Territory by United States citizens are excludable from taxable income because earned in a foreign country. *McComish v. Commissioner,* 580 F.2d 1323 (9th Cir.1978).

██ Defendant's arguments that the Marshall Islanders cannot invoke the just compensation clause of the Fifth Amendment absent an extension to them of its applicability by Congress are substantial. The cases defendant relies upon establish that the Trust Territory politically is independent of the United States and that under the Trusteeship Agreement the United States' obligation primarily is to nurture

the Trust Territory toward self-government. That is not the end of the matter, however. The question ultimately comes down to whether the protections of the Bill of Rights are conveyed to the Marshall Islanders by the force of the Constitution and our system of government.

At the conclusion of oral argument counsel were advised that defendant's motion to dismiss probably would be allowed as to the taking claims on the ground that the complaint failed to state a claim on which relief could be granted. Further reflection and review of applicable precedent has changed that tentative conclusion.

During the course of the program to test atomic weapons, the United States created a relationship with plaintiffs that exceeded in both nature and degree the relationship normally taken with a "foreign" country or by a trustee charged to protect the inhabitants against the loss of their lands and resources and to protect their health. The United States has accorded the people of the Marshall Islands benefits which far surpass the benefits normally extended to citizens of foreign nations. In addition, in 48 U.S.C. § 1681, Congress has acted with respect to these plaintiffs and their rights. Congress has ratified the powers conferred upon the President and the actions taken to administer the Trust Territory.

The Bill of Rights incorporates protections to society that are basic to our constitutional system of government. These protections are rooted in the recognition that government power is subject to arbitrary abuse. There is no suggestion that the protections of the just compensation clause in the Fifth Amendment are any less "fundamental" than the other protections enumerated in the rest of the Bill of Rights. All of the restraints of the Bill of Rights are applicable to the United States wherever it has acted. The concept that the Bill of Rights and other constitutional protections against arbitrary government are to be applied selectively on a territorial basis cannot be justified in the 1980's.

Accordingly, on the basis of the foregoing, defendant's motion to dismiss is denied. Defendant shall file 30 days from this date its answer to each of the causes of action alleged in the complaint.